Filed 1/12/17

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.F., a Person Coming Under the Juvenile Court Law. | |
| | D068971 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J237131) |
| v. | |
| M.F., a Minor, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Aaron H. Katz, Judge. Affirmed in part and reversed in part.

Lindsey M. Ball, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon Jr., Randall D. Einhorn and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, IV and V.

Defendant M.F. appeals from the juvenile court's disposition order declaring him a ward of the court pursuant to Welfare and Institutions Code[1] section 602, committing him to a residential program, and setting probation conditions. He contends that the court erred by: (1) admitting cumulative and prejudicial testimony and exhibits at the disposition hearing; (2) committing him to a 480-day residential program; (3) imposing an unconstitutionally overbroad probation condition restricting his possession of electronic devices; (4) designating one of his offenses as a felony without a proper section 702 finding; and (5) failing to deduct his predisposition custody credits when calculating his maximum term of confinement.

We conclude that the juvenile court erred in imposing an overly broad probation condition regarding electronic devices and in failing to deduct predisposition custody credits when determining M.F.'s maximum time of confinement.[2] We therefore reverse the disposition order in part, and remand for the juvenile court to modify its order to include: (1) a more narrowly tailored probation condition, and (2) a deduction of M.F.'s

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Welfare and Institutions Code.

[2]    M.F. recently filed a notice of abandonment of appeal and request for dismissal. Pursuant to California Rules of Court, rule 8.316(b)(2), we retain jurisdiction to deny a request for dismissal when it occurs after the appellate record has been filed, particularly if the appeal "poses an issue of broad public interest that is likely to recur." (*People v. Scarbrough* (2015) 240 Cal.App.4th 916, 920, fn. 2; see also *Lucchesi v. City of San Jose* (1980) 104 Cal.App.3d 323, 326, fn. 2.) In this case, we denied the dismissal request to address the constitutionality of the electronic device probation condition.

predisposition custody credits in its determination of his maximum period of confinement. In all other respects, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

In May 2015, police detained M.F. at his high school after he gave one of his teachers a letter stating that she "should be worried about getting shot," and that she "did not know what her students were capable of or what they may have at home." When detained, he was wearing an empty holster. The police searched M.F.'s backpack and found journals that described a plan to kill individuals associated with schools that he had attended.[3] The journals also contained a list of supplies that he would need to carry out his plan and "hit lists" of potential victims, with various types of "punishments" (such as wound, torture, death, rape, or a combination thereof) next to each name. In addition, one journal entry indicated that M.F. had been "faking it" while participating in anger management and counseling following his 2013 expulsion.

The police searched M.F.'s bedroom and found 20 rounds of live ammunition, several replica firearms, gun magazines, gun cleaning equipment and gun holsters, including one for a Glock firearm, a handgun case, a folding knife, black ski masks and a balaclava (a knit cap that covers the head and shoulders). The police also found tactical

---

[3]    In 2013, M.F. was expelled from another school for dressing in tactical gear on Halloween and carrying a binder that contained materials referencing Columbine High School. He then attended a Juvenile Court and Community School before enrolling in the school where he was ultimately detained.

gear, including a ballistic helmet, vest and armor plates. Several items found in M.F.'s bedroom had been checked off on his supply list.

M.F. told police that he had been involved in a militia for several years and said that he had shot approximately 1,500 rounds of ammunition during firearms training. He also admitted having borrowed a Glock and a rifle from militia members, which he had kept hidden, but claimed that he had returned the guns. M.F. made similar statements in an interview with a probation officer. In addition, he indicated that the militia had given him body armor, which he said he used "mostly" for his job as a paintball referee. He claimed that his journal entries were intended to be cathartic and he had no intention of physically harming anyone. Regarding his participation in anger management and decision-making counseling in 2014, he admitted that the programs had been ineffective in helping him appropriately channel his anger.

B.    *Procedural background*

The San Diego County District Attorney filed a juvenile wardship petition (§ 602) against M.F., alleging that he had made criminal threats (Pen. Code, § 422), threatened a public employee (Pen. Code, § 71), and possessed ammunition (Pen. Code, § 29650). In June 2015, he admitted the allegations in the petition.

In August 2015, following a contested disposition hearing, the court declared M.F. a ward of the court, removed him from his parents' custody and committed him to the Youthful Offender Unit (YOU) for up to 480 days.

M.F. filed a timely notice of appeal.

4

DISCUSSION

I.    Admission of Evidence at the Disposition Hearing

A.    *Additional Facts*

At the disposition hearing, the prosecution called Officer Garrett, a detective with firearms experience who was assigned to the case, to testify. M.F.'s counsel objected, arguing that Officer Garrett's testimony would be irrelevant and more prejudicial than probative.[4] The court overruled the objection, indicating that it wanted to fully understand the case, including the materials recently discovered following a forensic investigation of M.F.'s computer, to ensure a proper disposition.

Officer Garrett testified that M.F.'s bedroom contained ammunition that would work only in real firearms, cleaning equipment for real firearms and a Glock handgun case. He also testified about notes found in the Glock case, which indicated that the weapon was hidden elsewhere. He described M.F.'s journal entries in which he referred to hiding weapons in his mattress and the discovery by police of a slit in his mattress with a hollowed out space inside. In addition, Officer Garrett testified that M.F.'s tactical gear appeared to be real, and that one of the firearms shown in a video taken in his bedroom appeared to be real and was never found by the police. He further testified that the police had been unable to verify the existence of the militia groups referenced in M.F.'s journals.

---

[4]    M.F.'s counsel objected two additional times during the testimony, objecting to testimony regarding materials found on M.F.'s computer as cumulative and to the exhibits entered in evidence as cumulative and as more prejudicial than probative.

Officer Garrett also testified regarding his examination of M.F.'s cell phone, which contained a video of M.F. loading a gun and aiming it at a target in his bedroom. The phone also contained an album entitled "militia," which included videos of M.F. conducting target practice, standing at a window and aiming a realistic looking gun at the head of a bicyclist riding by, and practicing tactical maneuvers, and photographs depicting violence toward police officers. In addition, the cell phone contained photographs of school manuals describing procedures for dealing with an armed intruder, a hostage or barricade situation, and a bomb threat. The cell phone further contained a text message to M.F.s' girlfriend, sent the day before his arrest, stating that he was carrying his Glock "concealed."

Officer Garrett also testified regarding information found on M.F.'s computer. Investigation of the computer revealed a history of Google searches relating to dead children and school shootings, thousands of photographs of weapons, photographs of one of his schools, and information regarding how to hide guns or gun magazines. The computer also contained a pornographic video filmed in M.F.'s bedroom, manuals referencing violence against women and a Skype video in which he threatened potential harm to his girlfriend.

Officer Garrett further provided the foundation for the prosecution's exhibits, which the court accepted into evidence. The exhibits included copies of pages from M.F.'s journal (including the list of potential victims, the supply list and plans), four examples of photographs advocating or depicting violence against police officers, a photograph of his tactical gear, a photograph of M.F. dressed in tactical gear holding a

6

threatening message addressed to his school district. The exhibits also included photographs of ammunition found in his bedroom and of the notes found in the Glock case. One of these notes said "Too Late!!! My 2nd Amendment will NOT be infringed!!" and the other, dated 2014, indicated that the Glock had been moved and that the airsoft training pistol was a decoy.

B.      *Argument*

M.F. contends that the juvenile court erred in allowing Officer Garrett to testify, and in admitting exhibits pertaining to evidence contained on his cell phone and computer, over his counsel's objection, because the evidence was cumulative and prejudicial.

C.      *Governing law*

In making its disposition ruling, the juvenile court is required to consider public safety, victim redress and the best interests of the minor. (§ 202, subd. (d).) The court must also take into account: (1) the minor's age, (2) the circumstances and gravity of the minor's offense, and (3) any prior history of delinquency. (§ 725.5.) In addition, pursuant to section 706, "[t]he court shall receive in evidence the social study of the minor made by the probation officer and any other relevant and material evidence that may be offered." (See also Cal. Rules of Court, rule 5.785(b) ["The court must receive in evidence and consider the social study and any relevant evidence offered by the petitioner, the child, or the parent or guardian."].)

There is therefore a strong public policy of ensuring that a juvenile court judge has broad access to relevant information about a minor when conducting its disposition

7

analysis. (*In re Michael V.* (1986) 178 Cal.App.3d 159, 170 (*Michael V.*).) There is no statutory requirement that the Evidence Code be applied at a disposition hearing (§ 706). Rather, the hearing is governed by "less exacting rules" than the jurisdiction hearing (§ 701), which requires application of the Evidence Code. (*In re Eddie M.* (2003) 31 Cal.4th 480, 487.) At the disposition hearing, the juvenile court is permitted to consider evidence that would otherwise be inadmissible, if the evidence is relevant and material. (*Michael V.*, *supra*, at p. 170 [illegally obtained evidence]; *In re Vincent G.* (2008) 162 Cal.App.4th 238, 244 [hearsay evidence].) Although section 706 does not expressly incorporate the Evidence Code, it has been interpreted as impliedly incorporating Evidence Code section 352, allowing the court to limit admission of relevant evidence at disposition hearings when the evidence is cumulative, unduly prejudicial or time consuming, or likely to confuse the issues, to avoid any possible undesirable consequences of a literal interpretation of section 706.[5] (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843 (*Romeo C.*).) The juvenile court has broad discretion in determining the admissibility of evidence at the disposition hearing. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.)

---

[5] As used in Evidence Code section 352, the term "prejudice" does not refer to harm to a party's case stemming from relevant, probative evidence, but instead refers to the tendency of certain evidence "to evoke an emotional bias against a party because of extraneous factors unrelated to the issues." (*People v. Cortez* (2016) 63 Cal.4th 101, 128 (*Cortez*).)

D.    *Standard of review*

We review the court's ruling regarding the admissibility of evidence for an abuse of discretion.  (*People v. Myers* (2014) 227 Cal.App.4th 1219, 1224.)  "A court abuses its discretion when its ruling 'falls outside the bounds of reason.' "  (*Ibid.*)

E.    *Analysis*

M.F. argues that the testimony regarding the contents of his electronic devices did not add anything to the People's case and that the prosecution had no right to present potentially prejudicial cumulative evidence.  However, the mere fact that evidence is cumulative does not render it irrelevant.  (*People v. Smithey* (1999) 20 Cal.4th 936, 974.)  Moreover, as discussed above, the court is to have broad access to relevant information at a disposition hearing and is to consider any evidence that is relevant and material to the disposition, qualified only by the court's discretion to exclude evidence under Evidence Code Section 352.  (§ 706; *Michael V.*, *supra*, 178 Cal.App.3d at p. 170; *Romeo C.*, *supra*, 33 Cal.App.4th 1838, 1843; Cal. Rules of Court, rule 5.785(b).)  M.F.'s offenses included threatening to shoot a teacher and possessing live ammunition.  Any information that is probative of whether he harbored the intention and means to carry out such a threat would be germane to both public safety and his best interests—considerations that are highly relevant to the court's placement decision.  (§ 202, subd. (d).)

Although the juvenile court had considered reports containing general descriptions of some of the materials that police discovered on M.F.'s electronic devices, Officer Garrett's testimony provided an overview of the materials that he deemed most significant and provided information regarding where certain videos had been filmed,

9

including the video of M.F. conducting target practice. Officer Garrett's testimony also provided the benefit of his experience with firearms, as evidenced by his testimony regarding the functionality of the firearm depicted in one of the videos.

In his opening brief, M.F. argues that references to pornography and the Skype video threat were inflammatory and unduly prejudicial. However, Officer Garrett referred only briefly to one pornographic video (without further description of its content), focusing instead on his determination that the video had been filmed in M.F.'s bedroom. This testimony appears probative of the level of parental supervision of M.F. at home, a fact relevant to the nature of the commitment necessary to serve his best interests. (§ 202, subd. (d).) Testimony regarding the Skype video threat is relevant to public safety (§ 202, subd. (d)). To the extent that M.F. contends that this testimony was "uncorroborated," he had the opportunity to address the lack of corroboration on cross-examination.

Similarly, the contested exhibits were relevant because they: (1) illustrated, through four of the photographs found, what the reports meant when referring to materials advocating violence against police officers; (2) depicted the exact language and nature of a threat to the school district contained in one of the photographs; and (3) provided the text of the gun case notes, supplementing other information in the record. This evidence was not unduly prejudicial because it did not represent extraneous information tending to evoke emotional bias, but instead supported, supplemented or illustrated other evidence in the record relating to M.F.'s state of mind, his level of

10

planning and preparation for a violent attack and his potential access to weapons, all of which are probative to the issue of his proper placement.

The juvenile court did not abuse its discretion in admitting testimonial and documentary evidence regarding the contents of M.F.'s electronic devices.

II.    Propriety of M.F.'s Placement at YOU

A.    *Additional Facts*

M.F. was diagnosed with a serious medical condition following his detention. Treatment for the condition was expected to continue for several months. The condition would require around the clock access to medical care, periodic hospitalization, and isolation from other juvenile hall residents. The juvenile hall staff set up a private suite for M.F. near the health clinic.

After M.F. received his medical diagnosis, the court heard testimony regarding how to best accommodate his condition. His treating physician testified that detaining M.F. apart from his family and away from the hospital's teenager support group, which was available at the hospital where he was receiving treatment, would be "cruel," depriving him of beneficial emotional support. In addition, M.F.'s physician opined that M.F. would receive greater therapeutic benefit from being surrounded by family than from visitation and telephone calls with them.

The juvenile hall medical clinic's supervisor testified that she had concerns regarding the clinic's ability to address M.F.'s psychosocial issues. She worried that he might become angry and act out, explaining that children in isolation often become sad and depressed and tend to act out. In addition, the facility would have to expend

11

extensive efforts to prepare for M.F.'s care. The supervisor did not believe that returning M.F. to juvenile hall upon his release from the hospital would be in his best medical interest.

At the conclusion of the hearing, the juvenile court stated that it was concerned about the community, but also concerned about M.F., and commented that the court would have to design a solution that would accommodate the interests of both. Over the course of the proceedings, the court followed the situation closely, obtaining numerous updates on M.F.'s condition and circumstances. The court expressed concern about the psychological and emotional impact of M.F.'s detention, and indicated that the court wanted him to "be kept busy" and to have as much visitation as possible. The detention facility restructured its visiting hours to allow M.F.'s mother to spend most of the day with him, and he was also allowed visits from other family members.

Prior to the disposition hearing, the court also received and considered several reports from the probation department. The initial report described M.F. as being "at high level of risk" for continued delinquency and recommended placement in the Breaking Cycles program for up to 240 days, followed by participation in the Reflections program, in which he would be searched daily when arriving at school and have access to onsite mental health services. The department also recommended the use of cognitive behavior therapy to address his "dark and malicious thoughts," as reflected in his journals.

In a subsequent report, the probation department changed its recommendation to placement in the YOU program for 480 days. The YOU program would provide evidence-based cognitive behavioral therapy and close monitoring upon M.F.'s release. The department modified its placement recommendation based on its review of new evidence suggesting that M.F. had access to hidden weapons and that he had discussed concealing weapons, referred to violence toward police, and used a targeting scope on random people through his bedroom window.

In addition, the probation department relied on a report from Dr. B., a psychologist, who evaluated M.F. and believed that his psychological needs would be best met through residential treatment. Dr. B. indicated that treatment for cases like M.F.'s is complicated and often takes "long periods of time." She concluded that he might benefit from "more intensive interventions" to address his anger. Dr. B. was concerned about the fact that M.F. was not deterred by his first school expulsion, which instead appeared to have fueled his rage. She also noted that between his 2013 expulsion and his May 2015 detention, he had twice been caught carrying a weapon to school (first a small knife and then pepper spray). Dr. B. believed that the descriptions in M.F.'s journals were too detailed to be consistent with him merely venting his frustrations, as he claimed, and opined that given the materials found among his belongings, he presented a high risk for acting out violently. In addition, Dr. B. expressed concern about the content of certain online chats that M.F. engaged in regarding violence and planning an attack, which M.F. claimed were chats with himself. The department found implausible M.F.'s statement that the online chats were with himself, and viewed it as an attempt to deceive

Dr. B. and as evidence of his unwillingness to take accountability for his actions or to change his mindset. The probation department recommended that M.F. be detained until he had participated in therapy and rehabilitation sufficient to address his risks and needs.

In a subsequent supplemental report, the probation department addressed three different placement options: YOU, Breaking Cycles and in-home placement. The report indicated that, due to M.F.'s medical condition, his current plan for housing, education, visitation, recreation and free time would remain unchanged irrespective of whether he was placed in the YOU or Breaking Cycles program. In addition, either placement would allow him to continue to receive weekly individual therapy from a psychologist during his detention. In YOU, his medical isolation would preclude him from participating in much of the programming (designed for group participation), but he could potentially meet with his counselor more frequently and obtain videos and worksheets from some of the group programs. The program involves up to 480 days in custody (or a minimum of nine months, depending on the minor's progress). Although designed to meet the needs of severe and chronic juvenile offenders, YOU was described as appropriate for M.F. because of his severe and disturbing behavior, which was seen as posing a threat to both himself and the community. Under YOU, he would retain the same counselor throughout the program, with weekly counseling sessions continuing after his release and throughout his probation. Upon his release, he would also be supervised by the probation department and would have access to a job developer and to appropriate programs in the community.

The Breaking Cycles program supervisor reviewed M.F.'s case and indicated that it would not be an appropriate placement for him. However, if he were to be placed in

14

the program, Breaking Cycles could make accommodations by providing individualized counseling at juvenile hall. In addition, upon his release, he could participate in a community program with therapeutic services and supervision by the probation department and a community family monitor, but his health condition would prevent him from participating in the usual transition programs, Reflections and the Youth Day Center. The supplemental report also addressed supervised home placement, which would require periodic probation monitoring and extensive outpatient psychological and psychiatric counseling.

At the disposition hearing, M.F. presented the testimony of a probation officer assigned to the Breaking Cycles program. The officer testified that group therapy comprised the bulk of the custodial programming, but due to M.F.'s situation, the staff would have to meet with him individually at juvenile hall. Minors without substance abuse issues would typically be in custody for only three weeks, but could stay for up to 56 additional days if necessary. Upon release, minors with mental health issues would usually participate in the Reflections program. However, M.F. would age out of that program upon turning 18, in approximately eight months.

M.F. also presented testimony from Dr. S., the psychologist who had conducted his initial psychological evaluation. Dr. S. testified that the tests he administered, and Dr. B.'s test results did not show that M.F. would be at high risk for violence, disagreeing with Dr. B.'s conclusion. However, he admitted that the test results were based on M.F.'s truthfulness, and he had noted in his report that in evaluating M.F., he had been "unable

to determine the absence or presence of antisocial personality traits or disturbances with confidence" because M.F. was highly defensive. In addition, Dr. S. had previously opined that M.F. might be a challenge to treat and that he was ambivalent about returning to individual therapy. Unlike Dr. B., Dr. S. had not reviewed the most recent police reports, including those describing the materials found on M.F.'s computer. When presented with this information, he testified that none of the new information would have impacted his opinion, because such materials are just background facts and he relied more heavily on the psychological test findings. He admitted, however, that a person's journals containing consistent themes of violence and guns over a five-year period would be a fairly good indicator of the individual's thought processes.

At the conclusion of the disposition hearing, the juvenile court concluded that YOU was the appropriate program for M.F., finding that M.F. required "intensive substantial and significant rehabilitative services" in order to return to the community, and that YOU could provide such services. The court noted that it had reached its conclusion after having carefully considered M.F.'s medical needs and spending weeks developing a plan to accommodate them. The court found M.F.'s behavior concerning, in that M.F. appeared to have gone beyond journaling fantasies to acting on the fantasies by collecting ammunition, attempting to contact militia and possibly obtaining a gun. The court found Dr. S.'s testimony not to be "very credible" in light of his insistence that his opinion would not be altered by any of the recently obtained information. The court relied instead on Dr. B.'s opinion because she had reviewed all of the additional materials

16

and examined M.F. after his medical diagnosis. The court determined that it would take "months and months and months" of rehabilitation to ensure that M.F., his family members and the community would be safe upon his release. In addition, the court found that Breaking Cycles would be an inappropriate placement for M.F. because he would age out of necessary rehabilitative programs after eight months.

B.    *Argument*

M.F. contends that the juvenile court erred in failing to consider the emotional impact of his prolonged medical isolation while in custody. He further contends that the probation department's recommendation for the 480-day YOU placement is not supported by substantial evidence. He characterizes the probation department's recommendation as "erroneously based on speculation about a gun that was never found and [Dr. B.'s] inconclusive findings," and argues that the recommendation "lacked a credible basis" for its conclusion that he was unwilling to take responsibility for his actions. He also contends that the court's implicit determination that the 240-day Breaking Cycles program would be ineffective or inappropriate is not supported by substantial evidence because the record does not show that he would not respond to a less restrictive treatment with less custody time.

C.    *Governing law*

The purpose of juvenile court law is to protect both the public and the minor "and to preserve and strengthen the minor's family ties whenever possible." (§ 202, subd. (a).) A minor must receive "care, treatment and guidance" consistent with the best interest of the minor and the public and, if the minor has committed crimes, the disposition must

17

hold the minor accountable, be appropriate for the circumstances and conform with the interest of public safety and protection. (§ 202, subd. (b).) Therefore, in engaging in its deliberations, the court must consider public safety, victim redress and the best interests of the minor. (§ 202, subd. (d).)

Juvenile law contemplates a progressively more restrictive placement scheme, beginning with home placement under supervision and culminating in placement at the California Division of Juvenile Justice. (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159 (*Nicole H.*).) However, the court may consider a more restrictive commitment without prior recourse to other less restrictive placements. (*Ibid.*) The juvenile court is not required to expressly state on the record its reasons for rejecting less restrictive placements, but the record must contain some evidence that the court appropriately considered and rejected reasonable alternative placements. (*Ibid.*)

D. *Standard of review*

We review a juvenile court's placement decision for abuse of discretion. (*Nicole H.*, *supra,* 244 Cal.App.4th at p. 1154.) In doing so, we will affirm if there is substantial evidence to support the juvenile court's findings, indulging all reasonable inferences in support of its decision. (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147 (*Jose T.*).) In order to determine whether there is substantial evidence to support the court's placement decision, we examine the disposition hearing record in light of the purposes of the juvenile court law (§ 200 et seq.). (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.)

18

E.     *Application*

First, despite M.F.'s argument to the contrary, it is apparent from the record that the juvenile court considered the impact of detention on M.F.'s psychological well-being. Prior to the disposition hearing, the court heard testimony regarding the psychological effects of isolation on someone with his medical condition. The court addressed the issue by ordering substantial and liberal family visitation, which balanced M.F.'s need for emotional support with concerns regarding public safety. This balance would be maintained upon disposition because the YOU supervisor reported that M.F.'s current visitation plan would remain unchanged. In addition, the court relied on the opinion of a psychologist, Dr. B., who evaluated M.F. with knowledge of his medical diagnosis and opined that his needs "would be best met in a residential treatment facility."

Second, although M.F. is a first time offender, the evidence established an escalating pattern of concerning non-adjudicated behavior leading up to his offense, beginning in 2013 when he was caught with disturbing materials and expelled from school, followed by his documenting a detailed plan to harm specific individuals, his assembly of various items on a checklist associated with the plan and his taking weapons to school (a knife and pepper spray). In addition, M.F.'s pronounced preoccupation with gun violence was evidenced in videos showing him aiming a gun at a person outside his home, images advocating police killings and evidence of an additional threat he made to a school district. There was also ample evidence that M.F. would likely have access to firearms if released to the community, creating a public safety concern. For example, M.F. implied in his threatening note to his teacher that he had access to a gun. In

19

addition, Officer Garrett testified that one of the videos taken in M.F.'s bedroom showed him holding a real firearm that was never recovered. M.F. was caught wearing an empty Glock holster and had recently sent a text to his girlfriend saying that he had carried the weapon the day before. The police found an empty Glock case in his bedroom that contained notes stating that the gun was hidden where police would not find it. Further, his journal referenced his hiding weapons.[6] In addition, M.F. admitted to having access to guns through his contact with friends in a militia group.

Dr. B. opined that M.F. presented a high risk of acting out violently, based in part on the inconsistency between his responses to her questions, and the detailed planning evidenced in his journals and in other materials in his possession. She indicated that residential treatment would be the best option and opined that treatment for his condition is complicated, and was likely to require psychotherapy and behavioral therapy "for long periods of time." Dr. S. also opined that M.F.'s treatment might be "challenging," because he required individual therapy, but was ambivalent about participating in it and might be defensive in sessions. Additionally, M.F. admitted to "faking" his way through two months of required counseling and anger management sessions following his 2013 expulsion.

---

[6] M.F. also contends that the juvenile court improperly speculated at the disposition hearing that M.F. put the notes in the gun case and abused its discretion by considering such speculation in rendering its decision. However, because there is substantial evidence that M.F. may have access to guns upon his release, irrespective of who drafted or placed those notes in the gun case, we conclude that any purported error resulting from the court's "speculation" would not have been prejudicial.

Dr. B. and the probation department were also concerned about M.F.'s explanation that his online chats about planning a violent attack were communications that he had with himself. M.F. argues that the department lacked a credible basis for viewing the statement as evidence that he was unwilling to take responsibility for his actions. However, even if M.F. is now willing to attempt to change his patterns of behavior, the facts summarized above represent substantial evidence supporting the juvenile court's finding that M.F. will require intensive therapy for a prolonged time period before he may be safely released into the community.

In issuing its disposition order, the court expressed its concern that M.F. receive psychological treatment of sufficient duration to allow for his safe release, as well as appropriate services upon reentry into the community. Both the Breaking Cycles and YOU program would provide M.F. with the benefit of the recommended individual therapy during the course of his confinement. However, a Breaking Cycles commitment for 240 days would typically provide for only a few months of custodial treatment. If the custodial treatment were to be extended to the full 240 days, M.F. would be too old to participate in the recommended Reflections reentry program upon his release. In contrast, the YOU program would allow M.F. to undergo custodial psychotherapy for several months, followed by a prolonged reentry program involving the same counselor assigned to him at the outset of the program.

Substantial evidence indicates that M.F. requires prolonged residential therapy to support his safe release into the community. The YOU program can provide M.F. with a longer term of confined therapy and appropriate reentry services, in contrast to the shorter

21

duration and reentry limitations associated with the Breaking Cycles program, amply supporting the juvenile court's findings that the YOU program would be a more appropriate placement.

III. Constitutionality of Electronic Device Probation Condition

A. *Argument*

Condition number 49 of the probation conditions that the juvenile court imposed provides as follows: "The minor shall not knowingly possess an electronic device, such as a computer, electronic notepad, paging device, or cell phone, except in the course of lawful employment or for a school-authorized project."[7] M.F. argues that the condition should either be stricken or modified. M.F. contends that this condition is unconstitutionally overbroad because it implicates his freedom to communicate and gather information.

B. *Governing Law*

The juvenile court has broad discretion to impose reasonable probation conditions. (§ 730, subd. (b); (*In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*)). Because juveniles require more guidance than adults do, and their constitutional rights are more limited, it may be appropriate for the juvenile court to impose a probation condition on a minor that would be improper or unconstitutional if imposed on an adult. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 910 (*Victor L.*).) However, the juvenile court's discretion is not unlimited; the court may not order probation conditions that are unconstitutionally

---

[7] M.F.'s counsel objected to imposition of the condition at the disposition hearing.

overbroad. (*Sheena K.*, *supra*, at p. 890.) A probation condition is unconstitutionally overbroad if it imposes limitations on the probationer's constitutional rights and is not narrowly tailored and reasonably related to the compelling state interest in reformation and rehabilitation. (*Ibid.*)

The right to free speech is a fundamental constitutionally protected right. (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147.) Laws that attempt to regulate expression are carefully scrutinized because they pose a particular danger of state abuse. (*In re Stevens* (2004) 119 Cal.App.4th 1228, 1237 (*Stevens*).) In today's society, wireless devices, such as cell phones, are considered an "important media for communication." (*Victor L.*, *supra*, 182 Cal.App.4th at p. 919.) In addition, courts have recognized the increasing importance of computer and Internet access (*People v. Pirali* (2013) 217 Cal.App.4th 1341, 1348 (*Pirali*), and have held that restricting such access impacts First Amendment rights (*Stevens*, *supra*, at p. 1236, citing *Ashcroft v. American Civil Liberties Union* (2004) 542 U.S. 656; *Clement v. California Dept. of Corrections* (9th Cir.2004) 364 F.3d 1148).

California appellate courts have generally upheld the constitutionality of probation conditions prohibiting the use of electronic devices as narrowly tailored when they are closely related to the circumstances of an adult offender's crime. (See *Pirali*, *supra,* 217 Cal.App.4th at p. 1343 [upholding prohibition on Internet use without probation officer preapproval when crime involved possession of child pornography on the appellant's computer]; *People v. Harrisson* (2005) 134 Cal.App.4th 637, 641, 647 [upholding prohibition on Internet access when crime involved Internet use in an attempt to solicit

23

sex with a minor]; but see *Stevens*, *supra,* 119 Cal.App.4th at pp. 1238-1239 [reversing prohibition on computer and Internet access when the appellant's molestation conviction was unrelated to his computer or Internet use].)

In *Victor L.,* an appellate court considered the constitutionality of probation conditions prohibiting a juvenile offender from possessing mobile communications equipment or a computer with Internet access. (*Victor L.*, *supra*, 182 Cal.App.4th at pp. 919-927.) The police discovered Victor sitting in a parked car in which weapons were found, surrounded by fellow gang members, and Victor admitted to possessing a weapon. (*Id.* at p. 908.) In upholding the mobile communications devices restriction, the appellate court noted that such devices are "tools of the trade for gang members," and concluded that the restriction was narrowly tailored to prevent future crimes because (1) it did not prohibit use of all communications devices; and (2) it had a legitimate probationary purpose since the use of a mobile device is more difficult to supervise, and the court may reasonably have concluded that Victor would not be able to resist using the device to contact other gang members. Thus, the probation condition at issue would increase the likelihood that he would comply with other probation conditions. (*Id.* at pp. 921-922.) The court also noted that the restriction was not an absolute ban on the possession or use of mobile communications devices because it contained an exception for use or possession authorized by the probation officer. (*Id.* at p. 922.) The court further concluded that the restriction on possessing an Internet-enabled computer was proper because it served the same purpose as the prohibition of mobile communications

devices by preventing use for improper purposes and promoting the enforceability of other probation conditions. (*Id.* at p. 926.)

C. *Standard of Review*

We review constitutional challenges to probation conditions de novo. (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

D. *Analysis*

The probation condition prohibiting M.F. from knowingly possessing an electronic device, except for purposes of employment or school projects, constitutes a restriction on his freedom of speech, because it interferes with his ability to communicate through the Internet and via cell phone. (See, *Stevens*, *supra*, 119 Cal.App.4th at p. 1236; *Victor L.*, *supra*, 182 Cal.App.4th at p. 919.) We must therefore determine whether the restriction is narrowly tailored and reasonably related to the compelling state interest in M.F.'s rehabilitation. (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) M.F.'s offenses are threatening gun violence and possessing ammunition. Evidence established that he routinely used the Internet to obtain information about guns and how to hide them, as well as other information that could assist him in planning and carrying out his threat. Thus, to the extent that the condition prohibits M.F.'s unsupervised use of an electronic device with Internet access, the restriction appears to be related to the circumstances of his crime and appropriately tailored to his rehabilitation under the reasoning applied in *Victor L.* (*Victor L.*, *supra*, 182 Cal.App.4th at pp. 921-922.)

25

However, the condition also appears to prohibit M.F. from using a wireless telephone handset in his home or a cell phone (irrespective of Internet access or text messaging capability), to communicate with anyone for any purpose other than education or employment. Such a prohibition on M.F.'s use of a telephone does not appear to be closely connected to the circumstances of his crime. His criminal threat was made on a piece of paper, and to the extent that there was evidence of other threats on his electronic devices, or of contacts with purported militia members, none is alleged to have occurred through oral telephonic communication. Unlike the circumstance in *Victor L.*, in which a cell phone was characterized as a tool of the trade for a juvenile gang member, the record in this case does not suggest that M.F. would be likely to use an electronic device limited to oral communications in a way that would hinder his rehabilitation.

We therefore conclude that the probation condition barring M.F.'s knowing possession or use of all electronic devices, except for the limited purpose of employment or school projects, imposes a restriction on his freedom of speech that is not narrowly tailored to the circumstances of his crimes and his rehabilitation. For example, M.F. should be permitted to use and possess a telephone (without Internet or text messaging capability), such as a basic cell phone or wireless telephone handset. Accordingly, we direct the juvenile court to modify the condition to identify more precisely the nature of the electronic devices that the court seeks to prohibit. In doing so, the court should consider the purpose that this condition is intended to serve, in the context of his other probation conditions, and how it may be tailored to best help M.F. avoid repeating his offense or generally aid in his rehabilitation.

IV.     Compliance with Section 702 (Designation of Felony or Misdemeanor)

M.F. contends that the trial court erred in failing to declare on the record whether his violation of Penal Code section 422 (criminal threat) was a felony or a misdemeanor, as required by section 702. He requests that we remand his case and order the juvenile court to make the required pronouncement. We conclude that remand for this purpose is unnecessary because the record is clear that the court determined that the offense was a felony.

A violation of Penal Code section 422 may be punishable as a misdemeanor or as a felony. (Pen. Code, §§ 422, subd. (a) & 17, subd. (b).) Under section 702, when a minor has committed this type of offense, the court is required to designate the offense as a misdemeanor or felony. The court's express declaration is mandatory. (*In re Manzy W.* (1997) 14 Cal.4th 1199, 1204 (*Manzy W.*); see Cal. Rules of Court, rule 5.778(f)(9) ["the court must consider which description applies and expressly declare on the record that it has made such consideration"].) One purpose of the mandatory designation requirement is to ensure that the court is aware of, and actually exercises, its discretion under section 702. (*Manzy W.*, *supra*, at p. 1207.) However, the juvenile court's failure to make an express declaration does not compel an automatic remand; rather, the court's awareness of its discretion to treat an offense as a misdemeanor may be established from a review of the record as a whole. (*Id.* at p. 1209.)

The June 2015 hearing transcript establishes that the juvenile court declared the criminal threat to be a "violation of Penal Code section 422, a felony," in connection with M.F.'s admission of the offense. The hearing minutes similarly reflect the court's

27

declaration. In addition, prior to the disposition hearing, M.F.'s counsel indicated that M.F. had admitted to offenses "that are wobblers," alerting the court to its discretion. At the disposition hearing, the court referenced the "concerning" nature of M.F.'s conduct and committed him to custody for up to 480 days in a program appropriate for minors who have committed "serious felony offenses and or have lengthy criminal histories." Accordingly, the record as a whole establishes that the juvenile court was aware of its discretion to treat the criminal threat offense as a misdemeanor and chose not to do so. (*Manzy W., supra*, 14 Cal.4th at p. 1209.)

V.      Calculation of Predisposition Custody Credits

M.F. contends that the juvenile court erred by not including his predisposition custody credits when determining his maximum period of confinement. The prosecution argues that the juvenile court properly made a finding of the maximum term of confinement, but does not address the issue of predisposition custody credits. The disposition must specify the minor's maximum term of physical confinement, which must include credit for time spent in custody prior to the disposition hearing. (§ 726, subd. (d)(1); see *In re A.M.* (2014) 225 Cal.App.4th 1075, 1085; see also Cal. Rules of Court, rule 5.795(b).) The court determined M.F.'s maximum term of physical confinement (3 years 2 months) at the June 2015 hearing, but neither the June 2015 order nor the August 2015 disposition order reflects any deduction from the maximum term of confinement for the time he spent in predisposition custody. On appeal, M.F. contends that he spent a total of 105 days in custody prior to his disposition hearing. The record shows that he was taken into custody on May 8, 2015, and remained in custody (either in

28

juvenile hall or under guard at the hospital), until the disposition hearing on August 21, 2015, for a total of 105 days. Thus, M.F. is entitled to 105 days of predisposition custody credits against his maximum aggregate period of confinement, which must be documented in the disposition order.

## DISPOSITION

The disposition order is reversed as to probation condition number 49 and the predisposition custody credits to which M.F. is entitled. The matter is remanded to the juvenile court with directions to modify its order consistent with this opinion. The order is affirmed in all other respects.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

29